IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 14-CR- 00138 -LRR |
| | ) | |
| | ) | **Count 1** |
| Plaintiff, | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to: Make and Use |
| | ) | Materially False Statements and |
| vs. | ) | Documents; Sell Misbranded |
| | ) | Meat; and Commit Mail and Wire |
| | ) | Fraud |
| JALEL AOSSEY, | ) | **Counts 2 - 4** |
| | ) | 21 U.S.C. § 611 |
| WILLIAM "YAHYA" AOSSEY, | ) | False Statements on Export |
| | ) | Certificates |
| MIDAMAR CORPORATION, | ) | **Counts 5 - 47** |
| | ) | 18 U.S.C. § 1343 |
| ISLAMIC SERVICES OF AMERICA, and | ) | Wire Fraud |
| | ) | **Wire Fraud Forfeiture Allegation** |
| ISA, INC. d/b/a "Islamic Services of | ) | **Counts 48 - 91** |
| America, Inc.," | ) | 18 U.S.C. § 1956(a)(2)(A) |
| | ) | Money Laundering |
| Defendants. | ) | **Count 92** |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | Money Laundering Conspiracy |
| | ) | **Money Laundering Forfeiture** |
| | ) | **Allegation** |
| | ) | |

PRESENTED IN OPEN COURT
BY THE
FOREMAN OF THE GRAND JURY
And filed 12/5/14
ROBERT L. PHELPS, CLERK

## INDICTMENT

The Grand Jury charges:

### A.   Introduction

At all times relevant to this Indictment:

#### United States Department of Agriculture (USDA)

1.   The USDA Food Safety and Inspection Service (FSIS) was the public
health agency within USDA responsible for ensuring that beef products were safe,
wholesome, and accurately labeled.

2.   USDA Agriculture Marketing Service (AMS) was the division of USDA
responsible for verifying that beef originating in the United States met certain
standards and regulations established by the USDA and by each country that
imported beef products from the United States.  AMS maintained an online
database FSIS inspectors and exporters were to use to verify that each shipment
of beef intended for export from the United States was properly labeled and
eligible to be exported to the designated country.

3.   In order to fulfill its regulatory and oversight responsibilities, the USDA
depended upon exporters to accurately label, mark, and brand their beef products
intended for export from the United States.  This included the requirement that
all exterior beef product packaging and product labels contain a USDA
establishment number to accurately reflect the source of the products.

4.   In addition, certain documents were required to be accurately completed
to attest to: the identity of the USDA establishment from where the meat

2

originated; the wholesomeness of the meat; and to provide other information required to assist the USDA in ensuring that the meat was fit for consumption and eligible to be exported to the designated country.

5. Among the specific documents required by the USDA to be accurately completed in order for beef to be eligible for export from the United States were an "Application for Export Certificate," FSIS Form 9060-6; a so-called "Export Certificate," FSIS Form 9060-5; and a "Letterhead Certificate," FSIS Form 2630-9.

6. In addition, all labels attached to or contained within beef product packages shipped for export from the United States were required, prior to their use, to be approved by USDA for content, and to ensure that any label or ink that may come in contact with the beef would not contaminate the beef.

### Midamar Corporation

7. Defendant Midamar Corporation (MIDAMAR) was incorporated as a business in the State of Iowa and operated out of its headquarters at 1105 60th Ave SW, Cedar Rapids, Iowa.

8. Defendant MIDAMAR's corporate directors, as reflected in filings with the Iowa Secretary of State, were defendants, JALEL AOSSEY and WILLIAM "YAHYA" AOSSEY; their father "W.B.A., Jr." (MIDAMAR's founder); and "J.S."

9. Defendant MIDAMAR was in the business of selling and distributing food products throughout the world.

3

10. Defendant MIDAMAR maintained a public website, www.midamar.com. Defendant MIDAMAR advertised its business, and promoted and sold its products, through this website. By at least about August 28, 2010, the website contained the following statements, claims, and representations, in part, under the section headings noted below:

### Midamar Is The Leader In All Things Halal

Established in 1974, Midamar Corporation is a leading U.S. based Halal Food Brand and Global Supply Chain Management Company Serving the Middle East, South East Asia and the Far East.

\*　\*　\*

### International Development

With much of the growth in the Middle East and Far East, MIDAMAR was a leader in developing Halal food products, as well as a pioneer in exporting quality U.S.A. products in total compliance to ever-changing and demanding newly developing import country regulations.

\*　\*　\*

### U.S. Development of Halal Food Market

Midamar's commitment is to make the highest quality Halal products available to all Muslim consumers. The Midamar food name is recognized in the diverse and multi-cultural Muslim societies of the U.S.A. Muslim consumers, especially the children and youth, have come to love American food just as their friends and neighbors do. Further, Midamar's continued goal is to satisfy the Western and Ethnic Halal food requests by Muslim consumers wanting to be part of Western society, yet still remain faithful to the teachings of Islam with regard to what is Halal and Haram.

\*　\*　\*

### Halal Integrity

As a Muslim Owned Company since our founding in 1974, Midamar has overseen our Halal slaughter process. Concurrently

4

we also engage the Halal certification and auditing services of Islamic Services of America (ISA). In the context of Islam or Islamic Law there is no requirement that a company under Muslim ownership be Halal certified if those performing the slaughter are Muslim and the Muslim owners have complete control over the Halal supply chain. However, international regulations and custom requirements by foreign countries may require food and other imported goods to bear Halal certification by a globally recognized and reputable Halal certifying body. Thus you will find that Midamar carries both our own Halal certification protocols as well as those of Islamic Services of America (ISA). Further, Midamar has been and continues to be inspected by the religious and health ministries of foreign governments including but not limited to Malaysia, Indonesia, and the UAE. In the end, Halal integrity is a matter of trust and transparency. Midamar proudly welcomes further inquiries into our Halal practices and procedures.

\*   \*   \*

## Halal Certification
Midamar proudly utilizes the globally recognized Halal certification and auditing services of Islamic Services of America (ISA). ISA is the leading Halal Certification body in the United States and North America and recognized internationally in every sector of the Halal industry including meat and poultry Halal slaughter and production services. ISA has established many of the standards and procedures commonly found in the US food industry today.

\*   \*   \*

## Halal Glossary
- **Halal** – Permissible or lawful. In the context of meat and poultry it means the animal is permissible to eat and has been slaughtered in accordance with Islamic law.

- **Haram** – Not permissible or forbidden. In the context of meat and poultry it means either the animal does not fit those animals permitted to be consumed or is not slaughtered in accordance with Islamic law.

5

- **Penetrative Captive Bolt Stunning** -- Hand held unit used on cattle for non-Halal slaughter. The captive bolt gun shoots a retractable steel rod into the head of the animal puncturing the skull and brain causing the animal to die from brain hemorrhage. This process is the most common method used in the US beef industry today. Captive bolt stunning kills the animal. The use of penetrative captive bolt stunning negates the Halal slaughter process.

\* \* \*

## Owner's Message

Midamar is North America's pioneer and oldest Halal food company in North America having been in business for over 35 years. As a Muslim family owned company since our founding in 1974, we take great pride in setting the Halal standard for Halal product development and supply to Halal consumers not only in the United States but the world over. Inshallah (God Willing), we will continue our leadership in the years ahead.

Midamar is the first company to be approved by many International Islamic Organizations in countries such as Malaysia, Indonesia, Saudi Arabia, Singapore, Kuwait, UAE, and more. Additionally, we are audited and approved through Islamic Services of America (ISA) which was started in Iowa in 1975 and to this day is the most continuous Halal certifying body in the United States and is a leading internationally recognized Halal certifier throughout the Muslim and non-Muslim world. These Islamic bodies attest to our high standards of Halal production. Above our commitment to our consumers is our religious responsibility for our actions and intentions in this life especially in our commitment to providing Halal food to others.

\* \* \*

In meeting the true definition of Halal, Midamar hand slaughters all beef . . . products.

\* \* \*

By providing consumers openly with the Halal methods we employ, it is then a consumer's choice as to which of our products conforms to their personal beliefs. As owners of Midamar, we feel strongly that our Halal consumers should be knowledgeable and

6

comfortable with the explanation of our Halal slaughter practices and product development. Ultimately your ongoing satisfaction in our products, our customer service, and our Halal integrity as the reasons we exist.

Respectfully,

Jalel Aossey               Yahya Aossey
Director/Owner             Director/Owner

\*     \*     \*

**Halal Foods**
Since the founding of Midamar Corporation by Bill Aossey Jr. in 1974, Midamar has pioneered and continues to develop Halal practices, processes and procedures that define the USA Halal food industry.

\*     \*     \*

**Midamar Halal Brand**
- Commitment to unparalleled Halal Integrity

\*     \*     \*

**Export Services**
Demand for products exported from the USA is ever growing and Midamar's expertise in sourcing, translation, dating, and labeling food products to import country requirements is unmatched as we have over 35 years of experience in this field.

11. By about at least August 28, 2011, defendant MIDAMAR claimed on the above website, under the "Halal Foods" heading, that "Midamar is committed to maintaining the highest in Halal standards and integrity in all product lines."

12. Defendant MIDAMAR's website www.midamar.com was created on November 21, 1996. Defendant JALEL AOSSEY and MIDAMAR Corporation, 1105

7

60th Ave. SW, Cedar Rapids, Iowa, are identified as the registrants and administrative contacts for the website.

13.  Defendant MIDAMAR maintained a second public website, www.midamarhalal.com.  Defendant MIDAMAR advertised its business, and promoted and sold its products on this website.  By about at least March 9, 2011, the website contained the following statements, claims, and representations, in part, under the section headings noted below:

> **About**
> It is crucial that companies comply with USA Halal food laws and the laws of countries requiring products to be of Halal origin, certified Halal, and bearing the correct documentation from a reputable company in the Halal food industry.
>
> Midamar Halal foods are held to the highest integrity at the point of slaughter, processed with the best ingredients, under strict supervision of the USDA, followed up by superior customer service, and simply held to higher standards than that of our competitors.
>
>           \*   \*   \*
>
> **Owner's Message**
> Midamar is North America's pioneer and oldest Halal food company in North America having been in business for over 35 years. As a Muslim family owned company since our founding in 1974, we take great pride in setting the Halal standard for Halal product development and supply to Halal consumers not only in the United States but the world over.  Inshallah (God Willing), we will continue our leadership in the years ahead.
>
> Midamar is the first company to be approved by many International Islamic Organizations in countries such as Malaysia, Indonesia, Saudi Arabia, Singapore, Kuwait, UAE, and more.  Additionally, we are audited and approved through Islamic

8

Services of America (ISA) which was started in Iowa in 1975 and to this day is the most continuous Halal certifying body in the United States and is a leading internationally recognized Halal certifier throughout the Muslim and non-Muslim world. These Islamic bodies attest to our high standards of Halal production. Above our commitment to our consumers is our religious responsibility for our actions and intentions in this life, especially in our commitment to providing Halal food to others.

\* \* \*

In meeting the true definition of Halal, Midamar hand slaughters all beef . . . products.

\* \* \*

By providing consumers openly with the Halal methods we employ, it is then a consumer's choice as to which of our products conforms to their personal beliefs. As owners of Midamar, we feel strongly that our Halal consumers should be knowledgeable and comfortable with the explanation of our Halal slaughter practices and product development. Ultimately your ongoing satisfaction in our products, our customer service, and our Halal integrity as the reasons we exist.

Respectfully,

Jalel Aossey
Director/Owner

Yahya Aossey
Director/Owner

\* \* \*

**Halal Certification**
Midamar proudly utilizes the globally recognized Halal certification and auditing services of Islamic Services of America (ISA). ISA is the leading Halal Certification body in the United States and North America and recognized internationally in every sector of the Halal industry including meat and poultry Halal slaughter and production services. Midamar Halal meat and poultry are slaughtered by ISA-trained Muslim slaughtermen. These include Halal beef, chicken, turkey, lamb, duck, and goat meat and over 200 Halal meat and poultry products. ISA has established many of the standards and procedures commonly found in the US food industry today.

9

## Halal Glossary

- **Halal** – Permissible or lawful. In the context of meat and poultry it means the animal is permissible to eat and has been slaughtered in accordance with Islamic law.

- **Haram** – Not permissible or forbidden. In the context of meat and poultry it means either the animal does not fit those animals permitted to be consumed or is not slaughtered in accordance with Islamic law.

- **Penetrative Captive Bolt Stunning** -- Hand held unit used on cattle for non-Halal slaughter. The captive bolt gun shoots a retractable steel rod into the head of the animal puncturing the skull and brain causing the animal to die from brain hemorrhage. This process is the most common method used in the US beef industry today. Captive bolt stunning kills the animal. The use of penetrative captive bolt stunning negates the Halal slaughter process.

## Our Standards

For over 35 years, Midamar has upheld the highest standards in the Halal food industry. Our standards have ensured excellence in Halal food quality, integrity, service and satisfaction. Our standards include:

- Maintain the highest level of Halal integrity with no compromise on Shariah compliance.

\*   \*   \*

## FAQ's

### Is Midamar a Muslim owned Company?

Yes, we are a privately held Muslim owned business that has been serving customers for over 35 years. In fact we are USA Halal food pioneers. Being a Muslim owned company provided religious responsibility and commitment

10

to the integrity of our products marketing them as truly
quality Halal food.

### How do I know your products are Halal?
Being a Muslim family owned company we take great care
and religious responsibility to ensure that our Midamar
foods are strictly Halal. Testament to our commitment and
integrity is the fact that Midamar is the oldest, most
respected, and continuous quality Halal food company in
North America. Customer satisfaction and peace of mind in
our operations had enabled Midamar to remain the trusted
leader in Halal foods reaching beyond North America to
over 26 countries around the world since 1974.

14. By about at least June 9, 2011, defendant MIDAMAR made the following

claim on above website:

> **Halal Food of the Highest Quality and the Best
> Selection in America**
>
> **We guarantee the highest and most stringent Halal
> standards.** All Midamar products are certified Halal by
> the highly recognized Islamic Services of America.

15. Defendant MIDAMAR's website www.midamarhalal.com was created on

February 2, 2001. Defendant JALEL AOSSEY is identified as the registrant and

administrative contact for the website. The registrant organization for the

website is identified as Midamar Corporation, 1105 60th Ave. SW, Cedar Rapids,

Iowa.

Foreign Country Requirements

16. Many countries, including Malaysia, Indonesia, Kuwait, United Arab

Emirates (UAE), and Egypt, to name a few, restricted the import of purported Halal

11

beef products to products that had been certified as Halal by a certifying entity specifically approved by the respective importing country.

17. In addition to the above requirement, by at least May of 2008, Indonesia, Malaysia, Egypt, and other countries restricted the import of purported Halal beef products to those products that had been slaughtered at a facility specifically approved by the respective importing country.

18. In order for beef products to have been eligible for export from the United States, the shipment must also have complied with any restrictions imposed by the importing country.

19. It was incumbent upon the beef exporter to ensure that the beef product was eligible for export to the intended importing country. Therefore, the exporter was required to truthfully and accurately complete FSIS Form 9060-6, "Application for Export Certificate," which was to include a specification of all products contained in the shipment and a certification that the products met the import requirements of the importing country. The completed form was to be presented by the exporter to an FSIS inspector for approval and signature.

20. Upon approval of the Application for Export Certificate by FSIS, the exporter was to truthfully and accurately complete the export certificate applicable to the importing country and have that certificate approved by the appropriate official (typically a USDA veterinarian or another United States government official), as designated by the importing country.

12

21. When a shipment had been properly coded and authorized for export, AMS would issue a certificate (Audit, Review, and Compliance Form 1030 (Form 1030)) to verify to the exporter and to FSIS that the shipment had been authorized. This certificate was to accompany the shipment to the export destination. AMS charged exporters a fee for this Export Verification (EV) service and for the issuance of each EV certificate.

22. Most foreign countries, including Malaysia, Indonesia, Kuwait, Egypt, Saudi Arabia, and the UAE, restricted the import of Halal beef to products that: had been slaughtered according to Muslim religious requirements (as interpreted by the individual country in standards adopted by the country); were certified as having been slaughtered as Halal by a Muslim organization specifically approved by the importing country to provide such a service; and, upon import to the country, were accompanied by the required Halal certificate.

23. In addition to the above requirements, Malaysia also required: the Halal slaughter to be conducted by a competent "practicing Muslim slaughterman"; a "Muslim Halal checker to be permanently stationed" at the slaughter area; the Halal checker to be a "practicing Muslim"; all Halal carcasses and products to be stored in a separate chiller and freezer from non-Halal carcasses and products; the Halal certifying body to ensure that the Malaysian Protocol for the Halal Meat Production had been followed; that only a pneumatic percussive stunner[1] could be

---

[1] A pneumatic percussive stunner is an air activated device that, when used

13

used on the animal; and that any animal that suffered a cracked or broken skull from stunning could not be accepted as Halal.

24. Indonesia required the Halal slaughter to be performed by a Muslim slaughterman, who was properly trained, and who was a devoted Muslim. Indonesia prohibited the use of stunning equipment that caused physical disability or death to the animal, or which did not permit the animal to remain conscious for 3 -10 minutes after stunning.

25. UAE and Kuwait adhered to the Gulf Standard for Halal slaughter. Pursuant to that standard, the slaughterer must have been Muslim, Jewish, or Christian. The Halal slaughter was also required to be carried out "under the supervision of a rational equitable Muslim." Beating on the head or similar action, such as using a "bolt shot pistol," was not permitted.

26. Egypt restricted the import of Halal beef products to those products that had been certified by a Halal certifier specifically approved by Egypt.

27. The defendants were aware of the various country requirements as a result of: having attended trade shows, seminars, and conferences in the foreign countries; reviewed FSIS website information concerning the export requirements for various foreign countries; email exchanges with customers and others involved in the sale and certification of Halal meat products; and through other means.

---

properly, renders an animal immediately unconscious by a blow to the head. Unlike a captive bolt stun gun, a pneumatic percussive stunner does not penetrate the hide, skull, or brain of the animal.

14

### Islamic Services of America

28.     Islamic Services of America and ISA, Inc. were incorporated in the State of Iowa and operated out of their headquarters at 1105 60th Ave. SW, Cedar Rapids, Iowa. ISA, Inc. also adopted the name "Islamic Services of America, Inc." These entities are referred collectively throughout this indictment as "ISA" or "defendant ISA."

29.     Defendant ISA's corporate filings with the State of Iowa listed "W.B.A., Jr.," defendant JALEL AOSSEY, and defendant WILLIAM "YAHYA" AOSSEY as directors and officers of the entities identified in the preceding paragraph.

30.     Defendant ISA was in the business of certifying food products as Halal for customers throughout the world.

31.     Defendant ISA was one of the few organizations approved by Malaysia, Indonesia, Kuwait, Saudi Arabia, and the UAE to certify Halal beef for import into those countries. Defendant ISA was not approved to certify Halal beef for import into Egypt during the time relevant to this Indictment.

32.     Defendant ISA would inspect and certify beef slaughter or processing facilities on a periodic basis for purposes of determining whether the facility could be approved for Halal slaughter or processing. If approved, defendant ISA would issue the facility a certificate of approval for display by the approved facility.

33.     Defendant ISA would typically generate several documents for beef products, including: a certificate of origin to accompany the product from the ISA-

15

certified slaughter facility to any subsequent processor; a "Certificate of Islamic Slaughter" (also called a "Halal Export Certificate") to accompany products intended to be exported from the United States; and a so-called "Health Certificate," also intended to accompany exports. Defendant ISA's logo was also placed on the boxes and packages containing the purported Halal beef products that originated from an ISA certified facility.

34. The certificates and other documents completed by Defendant ISA, along with the ISA logo placed on boxes or other packaging, were intended by Defendant ISA to attest that the beef had been slaughtered and processed at the facility noted on each certificate, in accordance with the standards represented by Defendant ISA, and in compliance with the distinct requirements of each country by whom Defendant ISA was recognized as an approved Halal certifier, and to where the ISA certified beef was to be exported.

35. Defendant ISA maintained a public website, www.isaiowa.org. Defendant ISA advertised its business and promoted its services on this website. The website contained the following statements, claims, and representations, in part, under the section headings noted below:

### About I.S.A. – Who we Are
Halal certification and auditing services has made Islamic Services of America (I.S.A.) a globally recognized symbol of Halal integrity. Islamic Services of America is a leading Halal Certification body in the United States and North America, recognized internationally in every sector of the Halal industry including meat and poultry, slaughter and production services.

16

*   *   *

**Our History**
- I.    Integrity
- S.    Service
- A.    Authenticity

Our ethics, our respect for Muslim consumers, for importing country regulations, for U.S.D.A. – F.D.A., and for reputable industry are as solid as the foundation of our ethics and principles laid by our immigrant parents.

*   *   *

**Our Standards**

Islamic Services of America (I.S.A.) takes pride in being the oldest and most respected U.S.A. Halal certification agency. For over 35 years we have employed the most stringent standards to ensure that food, pharmaceutical, health and beauty, and other products are fully Shariah Halal compliant. This has earned the trust of consumers and industry members worldwide.

Halal slaughtered meat that bears Halal designation and certification must be qualified by a few basic principles:

- Muslim Slaughter – the slaughtering process must be conducted by a practicing Muslim who is of sound mind and has the explicit intention of performing a slaughter. The person doing the slaughter is clearly instructed in Islam to "Slaughter with mercy and slaughter swiftly."

- Halal intention – the person who is slaughtering must make the intention of performing the slaughter and must recite the "Tasmia" which is "Bismilah, Allahu Akbar" ( in the name of Allah and Allah is Great). This must be done out loud during the slaughter on each head.

*   *   *

**I.S.A. Director's Letter**

From day one, we have been truly committed to maintaining the integrity of both Halal certification and the science behind it.

17

I.S.A. was the first Halal certifier to be internationally recognized by Malaysia, Singapore, and Indonesian bodies – which are the strictest government regulatory agencies in the world. I.S.A. was also the first US certifier to be recognized in Saudi Arabia and the other countries in the Arabian Gulf.

Halal integrity, we maintain, is of utmost importance. As such, we at I.S.A. work closely with I.S.A. Halal compliant companies to develop the means to reach as many international Halal consuming markets as possible in an efficient and cost effective manner.

Our goal is to provide the most authentic and legitimate Halal service at the least possible disruption to your business.

\* \* \*

## Halal Accreditation

I.S.A. has been recognized by LP POM-MUI, AIFDC-ICU, Jakim and D.V.S. in Malaysia since their inceptions. Southeast Asia represents the world's most stringent enforced Halal standards. Their continuous recognition demonstrates I.S.A.'s commitment to the highest Halal standards while simultaneously making the certification process as seamless as possible for businesses.

JAKIM and D.V.S. approved since 1982.

Additionally the Muslim American Society and Islamic Centers across the USA have acknowledged I.S.A. for its integrity in maintaining the highest Halal Standards

\* \* \*

## Media Information

## No comprising [sic] on Halal principles and methods by pioneer certifier ISA

For over 35 years, we have employed the most stringent standards to ensure that food, pharmaceuticals, health and beauty, ingredients and other products are without doubt Shariah compliant. This has earned us trust of Muslims in the Middle East, SE Asia, North America and beyond.

18

With regards to Halal process, let's take for example the most well known and sought after Halal product – Meat. Any meat that bears Halal designation must be qualified by a few basic principles,

- ✓ Animal Welfare – this has been a part of Islam long before animal rights activists began lobbying for humane slaughtering methods. In Islam, farmers are instructed to feed animals proper diets and to treat them humanely. We do not slaughter 'pen raised' cattle. The cattle must be able to graze in a pasture occasionally.

- ✓ Muslim Slaughtered – the slaughtering process must be conducted by a practicing Muslim who is of sound mind and who has the explicit intention of performing a slaughter. The person doing the slaughter is clearly instructed in Islam to "Slaughter with mercy and slaughter swiftly."

- ✓ The person who is slaughtering must make the intention of performing the slaughter and then must recite "Tasmia" which is typically "Bismillah and Allahu Akbar" or "In the name of Allah and Allah is Greatest". This must be done out loud during the slaughter.

At ISA, all of our slaughter men are Muslim, and are capable of slaughtering 1000 head of cattle a day. The cattle are raised up to our standards and are the same breed from the same genetics. Absolutely no animal product is fed to Iowa Cattle. This is the law and part of the Iowa Cattleman's Association Legislation.

ISA only accepts Halal methods that follow Shariah in its purest form. It is important for Muslims to know the difference. When we say it is Halal, it is Halal based on the Islamic understanding of what is behind the meat. That means no tolerance for deviance in the form of "Tasmia" by tape recorder, phone, or by driving around the processing facility. We take a committed hard line approach and do not compromise.

\*   \*   \*

19

## Certification Services

Islamic Services of America's logo indicates that the Halal status of your product or service is being independently monitored by the staff of Islamic Services of America. Our logo is recognized by the Muslim consumer as the sign that your products meet the strictest standards of Halal.

\* \* \*

## Benefits of Halal Certification

By meeting Halal certification requirements, your company will have access to over 8 million Halal consumers in the USA and over 1.6 billion consumers worldwide. You will have opportunities in Halal markets that are currently closed to your products.

With over 35 years as a Halal certifier, I.S.A. ha developed a reputation for upholding Halal integrity.

\* \* \*

## Why Kosher is not Halal

Many people wrongly assume that Halal and Kosher are one and the same. If a product is Kosher certified, it does not mean the product is Halal. The Kosher process differs from what is allowable by the Islamic Shariah.

Another example of the difference between Halal and Kosher is the slaughter process. For Halal meat and poultry processing, the Muslim slaughter-man is required to acknowledge God's Creation and to thank God for providing sustenance by reciting a prayer before each and every slaughter with the statement, "In the name of God – God is the Greatest - Bismillahi Allahu Akbar."

The Shochet, or Jewish slaughter-man does not and is not, required to invoke God's name on each animal before each slaughter.

In Halal slaughtering, the entire carcass is utilized. With Kosher slaughtering, only the front fore quarter of the beef carcass is utilized. Within the meat industry, some companies and distributors attempt to claim to sell Kosher hind quarters as Halal beef. The Kosher hind quarters cannot be considered Halal

20

as the Shochet does not adhere to Islamic Law and Halal guidelines and does not pronounce the name of God before each slaughter.

Within Islam, Kosher slaughtering and handling is a respected process. It is important for consumers and food processors to understand the guidelines and differences between Halal and Kosher slaughter. To comply with Islamic guidelines invoking God's name before each slaughter is absolutely essential. The differences between Halal and Kosher slaughter rites must be clear so that consumers are not misled.

Halal and Kosher are similar but are as different as "vegan" and "vegetarian." In practice, many Kosher consumers consume Halal products and Halal consumers consume Kosher products. Consumers must be informed in order to choose the right products for their needs.

\* \* \*

### Islamic Slaughter and Supervision

Islamic Services of America employs the largest number of well-trained, highly qualified Islamic slaughter-men in the meat and poultry industry. Our slaughter-men travel throughout the United States to various U.S.D.A. and F.D.A. plants to perform Islamic supervision, inspection, and Halal slaughtering.

Halal products are derived from animals and/or poultry that have been slaughtered according to Islamic law under the following statement, "In the name of God – God is the Great - Bismillahi Allahu Akbar." The animals and/or poultry are slaughtered by means of a sharp knife, cutting through the skin, jugular vein, and trachea to result in thorough bleeding of the carcass in preparation for dressing and evisceration in accordance with Islamic guidelines. Halal products and production are properly separated, identified, and processed.

\* \* \*

### Terminology

- Penetrative Captive Bolt Stunning - Hand held unit used on cattle for non-Halal slaughter. The captive bolt gun shoots a

21

retractable steel rod into the head of the animal puncturing the skull and brain causing the animal to die from brain hemorrhage. This process is the most common method used in the US beef industry today. Captive bolt stunning kills the animal. The use of penetrative captive bolt stunning in any capacity negates the Halal slaughter process.

* * *

**Meat**

Islamic Services of America ensures that Halal slaughter methods, as outlined in the Shariah, are employed during Halal meat slaughter. This means well trained practicing Muslim slaughter men, reciting Tasmia in person. It also means that the animals are vegetarian fed, treated humanely, and that there is a proper hygienic process employed.

36. Defendant ISA's website www.isaiowa.org was created on September 6, 2002. Defendant JALEL AOSSEY is identified as the registrant and the administrative contact for the website. The registrant organization for the website is identified as Midamar Corporation, 1105 60th Ave. SW, Cedar Rapids, Iowa.

<u>Tri-Bin, Inc.</u>

37. Tri-Bin, Inc. (Tri-Bin) owns the land and building located at 1105 60th Avenue SW, the corporate offices and warehouse of Midamar Corporation. ISA's office was also located in the same building. Defendant MIDAMAR issued checks to Tri-Bin on a monthly basis that included rent payments for its operating location. Tri-Bin is owned by "W.B.A., Jr."

<u>PM</u>

38. PM operated a beef slaughter and production facility in Windom, Minnesota.

22

39. PM operated under United States Department of Agriculture (USDA) establishment number 683.

40. PM was Defendant MIDAMAR's primary supplier of slaughtered beef.

41. PM was annually certified by Defendant ISA.

42. The great majority of PM's business involved the slaughter of cattle by rabbis under Kosher ritual slaughter.

43. Some of the beef slaughtered by rabbis at PM, under Kosher ritual slaughter, was sold to Defendant MIDAMAR.

44. PM also produced beef for sale to Defendant MIDAMAR that had been slaughtered by Muslim slaughtermen employed by Defendant ISA. In an average week, the beef slaughtered by a Muslim slaughterman at PM represented only a relatively small fraction of all beef slaughtered at PM.

45. PM also slaughtered beef that had not been slaughtered by any religious slaughterman, including any rabbi or Muslim slaughterman, and beef for which the slaughter had not been supervised by any Muslim slaughterman. Some of this beef was sold to Defendant MIDAMAR.

46. Defendant ISA employed Muslim slaughtermen to personally perform ritual Halal slaughter at PM for beef sold to Defendant MIDAMAR. Although the slaughtermen were to be hired and supervised by Defendant ISA, they were paid from a MIDAMAR checking account.

47. The Muslim slaughtermen who worked at PM were required to pass

23

through security at PM and to sign in and out of the plant each time they worked at the plant.

48. A captive bolt stun gun was used to ensure that all beef cattle slaughtered at PM were rendered senseless and were dead. This device is operated by placing an air-powered gun to the head of the animal and pulling a trigger. When activated, the device shot a retractable steel rod into the head of the animal, puncturing the skull and brain, causing the animal to die from brain hemorrhage.

49. PM was not certified by Malaysia or Indonesia to export beef products to either country. Without such certification PM products were not authorized to be imported into either country. PM was approved to slaughter beef for export to other countries.

O.P.C., Inc.

50. O.P.C. operated a beef slaughter and production facility in Omaha, Nebraska. O.P.C. provided custom beef slaughter services for both religious and non-religious slaughter customers.

51. O.P.C. operated under United States Department of Agriculture (USDA) establishment number 889A.

52. O.P.C. occasionally slaughtered and processed beef for MIDAMAR but did not do so between about the middle of July 2007 through about April 2010.

53. O.P.C. was approved by both Malaysia and Indonesia to export beef to those countries between at least July 2007 and 2010, but O.P.C. did not sell any beef to

24

MIDAMAR during that time. ·OPC was also approved to slaughter beef for export to other countries.

**COUNT 1**
Conspiracy to: Make and Use Materially False Statements and Documents; Sell Misbranded Meat; and Commit Mail and Wire Fraud

54.  Paragraphs 1-53 of this Indictment are incorporated by this reference as if fully set forth here.

55.  Beginning in about 2007, and continuing into at least April 2012, defendants JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION (MIDAMAR), ISLAMIC SERVICES OF AMERICA (ISA), and ISA, INC., d/b/a "Islamic Services of America, Inc.," did knowingly and unlawfully conspire and agree with other persons known to the grand jury, to commit the following violations of law:

       1) in a matter within the jurisdiction of the Department of Agriculture, to cover up material facts by a scheme; in violation of Title 18, United States Code, Section 1001;

       2) in a matter within the jurisdiction of the Department of Agriculture, to make false and fraudulent statements and representations, in violation of Title 18, United States Code, Section 1001;

       3) in a matter within the jurisdiction of the Department of Agriculture, to make and use false documents in violation of Title 18, United States Code, Section 1001;

       4) to sell in commerce articles that had been misbranded, with intent to defraud, in violation of Title 21, United States Code, Section 610;

25

5) to make false statements on export certificates, with intent to defraud, in violation of Title 21, United States Code, Section 611;

6) to use the mail or a private or commercial interstate carrier for the purpose of executing or attempting to execute a scheme, to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1341;

7) to use the wire for the purpose of executing or attempting to execute a scheme, to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343.

## Manner and Means of the Conspiracy

56. As set out below, the defendants and others known to the grand jury generated a variety of fabricated certificates, writings, and representations, including export documents, that contained false, fraudulent, deceptive, and misleading claims and information concerning: the source and nature of beef products referenced in the certificates and writings; the manner of slaughter; the level of adherence to certain represented Halal practices and standards; and other matters, regarding the beef products marketed and sold by defendant MIDAMAR, and certified as Halal by defendant ISA and others.

57. The false, fraudulent, deceptive, and misleading certificates, writings, and representations were generated: 1) to give the false impression that the

26

accompanying shipments of beef products complied with the import requirements of the countries to where the beef was being shipped; 2) to give the false appearance that all United States Department of Agriculture requirements had been satisfied; 3) to give the false appearance that certain beef slaughter practices and standards had been followed; and 4) to result in the payment of money to the defendants and others.

58. Between at least April 2007 and about January 2010:

    a.   The USDA establishment number 683 markings were removed by defendant MIDAMAR employees from the individual vacuum-sealed beef product packages, using acetone or nail polish remover.

    b.   Defendant MIDAMAR employees produced new fraudulent labels to be placed on the exterior of boxes of beef received from PM.

    c.   Defendant MIDAMAR employees substituted false USDA establishment number 889A (representing O.P.C.) in place of USDA establishment number 683 (representing PM) on the boxes received from PM.

    d.   USDA establishment number 889A was placed on packages of beef products intended for export to Malaysia and Indonesia, in place of establishment number 683.

27

e.  USDA Export Certificates were generated by Defendant MIDAMAR for beef products intended for export to Malaysia and Indonesia. The certificates falsely stated the beef products originated from animals slaughtered at USDA establishment number 889A when, in truth and in fact, the products originated from animals slaughtered at USDA establishment number 683.

f.  Letterhead Certificates were also generated to falsely attest that the beef products intended for export to Malaysia and Indonesia had originated from USDA establishment number 889A when, in truth and in fact, the products originated from animals slaughtered at USDA establishment number 683.

g.  Defendant MIDAMAR employees sent the false Export Certificates and false Letterhead Certificates to USDA inspectors and veterinarians for signature, via the U.S. Mail or commercial courier service.

h.  The respective USDA inspectors and veterinarians signed the false Export and Letterhead Certificates in reliance upon the false information contained thereon.

i.  The false and fabricated documents referenced above accompanied the respective beef shipments to Malaysia and Indonesia.

28

59. At all times relevant to this Indictment:

    a.   Defendant MIDAMAR promoted its business and the use of Defendant ISA's Halal certification through a variety of trade shows, emails, publications, and other outreach efforts.

    b.   Defendants MIDAMAR and ISA promoted their businesses via the internet as noted elsewhere in this Indictment.

    c.   As part of the combined promotional efforts of defendants MIDAMAR and ISA, representations were repeatedly made that ISA adhered to "the highest," "the strictest," or the "most stringent" Halal standards, or claims to that effect. It was represented that defendant ISA takes a "committed hard line approach and do[es] not compromise" and only accepts Halal methods in their "purest form." Defendant ISA further claimed all of its "slaughter men are Muslim." Defendants MIDAMAR and ISA both explained on websites and elsewhere that Kosher was not Halal, and claimed that "[t]he use of penetrative captive bolt stunning in any capacity negates the Halal slaughter process." Defendants MIDAMAR and ISA made numerous others claims concerning beef products sold by defendant MIDAMAR and certified by defendant ISA.

    d.   Customer orders were taken by defendant MIDAMAR for the sale and export of Halal beef products to customers in Malaysia,

29

Indonesia, UAE, Kuwait, Egypt, and elsewhere. Similar orders were taken for the sale and shipment of Halal beef products to customers in the United States.

e. Defendant MIDAMAR placed orders by phone or email with PM for the slaughter and production of beef to be used to fill orders received by defendant MIDAMAR.

f. PM shipped beef products in interstate commerce to defendant MIDAMAR to fulfill orders placed with PM by defendant MIDAMAR.

g. Beef slaughtered and produced by PM, and shipped to defendant MIDAMAR, was marked by PM with PM's USDA establishment number, 683, on adhesive labels adhered to the exterior of the shipping boxes, or preprinted on the exterior of defendant MIDAMAR's product boxes; on the individual vacuum-sealed beef packages contained inside the shipping boxes; and on the accompanying documentation.

h. Beef products sold by defendant MIDAMAR were typically shipped in boxes containing defendant ISA's seal and a Halal logo.

i. Beef products sold by defendant MIDAMAR were shipped in interstate and foreign commerce via private and commercial carriers to customers within and outside the United States.

30

j. Beef products exported by defendant MIDAMAR were accepted by foreign countries for import into their countries.

k. Customers paid for beef products purchased from defendant MIDAMAR by making a wire transfer to defendant MIDAMAR's bank account at Cedar Rapids Bank and Trust (CRBT), account number with the last four digits "1568" or by other means.

l. On a periodic basis defendant MIDAMAR would "sweep" funds from account "1568" to be applied to its loan/line of credit with CRBT account number with the last four digits "2409."

m. Defendant MIDAMAR regularly drew upon its loan/line of credit with CRBT to fund its operating account, from which payments were made, by check and wire, to satisfy ongoing business expenses including marketing, internet services, payroll, product, rent, and shipping expenses.

60. At various times relevant to this indictment:

a. Contrary to representations made by defendants MIDAMAR and ISA, beef certified by defendant ISA as complying with the Halal slaughter standards promoted by defendants MIDAMAR and ISA, had not been slaughtered in accordance with the represented or required standards. For example:

    1. Between at least April 2010 and June 2012, all cattle slaughtered at PM, and marketed and sold by

31

defendant MIDAMAR as "Halal," had been shot in the head with a brain penetrating captive bolt stun gun, despite representations made by both defendants ISA and MIDAMAR that the "use of penetrative captive bolt stunning in any capacity negates the Halal slaughter process."

2. In many instances, beef slaughtered at PM and marketed and sold by defendant MIDAMAR as "Halal," was not slaughtered by a Muslim slaughterman, despite ISA's certification that the beef had been "Hand Slaughtered by a Muslim Slaughterman" or "Slaughtered by Muslim Slaughtermen."

3. In many instances, beef slaughtered at PM and marketed and sold by defendant MIDAMAR as "Halal," was neither slaughtered nor supervised by a Muslim slaughterman, despite representations made by defendants ISA and MIDAMAR that all beef needed to be slaughtered by a Muslim slaughterman in order to be designated Halal.

4. In many instances, the "Tasmia" was not pronounced at any time during the slaughter of beef cattle at PM. This was despite the representation that a Muslim slaughterman was required to personally recite the prayer "before each and every slaughter."

5. In many instances, hind quarters, and other beef products slaughtered as Kosher were marketed and sold in whole or in part as Halal beef, despite the representation that the "Kosher hind quarters cannot be considered Halal as the Shochet does not adhere to Islamic Law and Halal guidelines and does not pronounce the name of God before each slaughter" and despite other representations to the effect that Kosher does not equal Halal, and that defendant MIDAMAR would not market Kosher beef as Halal.

32

b. Samples of beef products were intentionally hidden within larger export shipments without the required documentation.

c. Where defendant ISA was not approved as a Halal certifier for a particular foreign country, Halal certificates were purchased from another Halal certifier approved by the foreign country, to give the false appearance that the accompanying beef products had been slaughtered by or under the supervision of the approved certifier, and therefore eligible to be exported to the foreign country.

d. Export documents for beef products apparently intended for export to Singapore were altered to reflect an ultimate destination of Malaysia after the documents had been signed by a USDA official. This was done to circumvent restrictions on certain beef exports to Malaysia.

e. Actual beef product production dates, required for food tracking and export compliance purposes, were not properly tracked and were thus "estimated" on export documents.

f. In addition to instances referenced elsewhere in this indictment, false health certificates were created to accompany beef exports. The false certificates were made to falsely appear as if they were certificates of the Department of Agriculture through the

33

unauthorized use of the Department seal on the documents.

Some of the certificates also contained the forged signature of a fictitious "Director" of ISA.

61.  Defendants JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR, and ISA, individually and through their authorized representatives, directed, oversaw, counseled, commanded, procured, approved of, and agreed to the commission of acts referenced above.

Overt Acts

62.  In furtherance of the above conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Northern District of Iowa, and elsewhere:

a.  USDA Export Certificates were generated, including on about the following dates, each of which is alleged as a separate overt act:

| | Certificate No. | Issue Date |
|---|---|---|
| 1. | MPG-317734 | June 20, 2007 |
| 2. | MPG-317737 | June 20, 2007 |
| 3. | MPG-317751 | August 17, 2007 |
| 4. | MPG-762485 | January 30, 2008 |
| 5. | MPG-762506 | April 24, 2008 |
| 6. | MPG-762632 | June 19, 2008 |
| 7. | MPH-057120 | July 17, 2008 |
| 8. | MPH-057127 | July 31, 2008 |
| 9. | MPH-057135 | August 27, 2008 |
| 10. | MPH-057143 | September 25, 2008 |
| 11. | MPH-057081 | October 21, 2008 |
| 12. | MPF-410206 | April 15, 2009 |
| 13. | MPF-410208 | April 16, 2009 |

34

| 14. | MPF-410224 | June 10, 2009 |
|-----|-----------|---------------|
| 15. | MPH-059082 | September 23, 2009 |
| 16. | MPH-059091 | October 21, 2009 |
| 17. | MPH-059099 | October 30, 2009 |
| 18. | MPH-059111 | November 19, 2009 |
| 19. | MPH-059115 | December 2, 2009 |
| 20. | MPH-059126 | December 30, 2009 |
| 21. | MPE-042868 | January 14, 2010 |
| 22. | MPE-042870 | January 14, 2010 |

b.  Letterhead Certificates were generated, for shipments to Malaysia and Indonesia, including on about the following dates, each of which is alleged as a separate overt act:

| | Certificate No. | Issue Date |
|-----|-----------|---------------|
| 1. | MPG-317734 | June 20, 2007 |
| 2. | MPG-317737 | June 20, 2007 |
| 3. | MPG-317751 | August 17, 2007 |
| 4. | MPG-762485 | January 30, 2008 |
| 5. | MPG-762506 | April 24, 2008 |
| 6. | MPG-762632 | June 19, 2008 |
| 7. | MPH-057120 | July 17, 2008 |
| 8. | MPH-057127 | July 31, 2008 |
| 9. | MPH-057135 | August 27, 2008 |
| 10. | MPH-057143 | September 25, 2008 |
| 11. | MPH-057081 | October 17, 2008 |
| 12. | MPF-410206 | April 15, 2009 |
| 13. | MPF-410208 | April 16, 2009 |
| 14. | MPF-410224 | June 10, 2009 |
| 15. | MPH-059082 | September 23, 2009 |
| 16. | MPH-059091 | October 21, 2009 |
| 17. | MPH-059099 | October 30, 2009 |
| 18. | MPH-059111 | November 19, 2009 |
| 19. | MPH-059115 | December 2, 2009 |
| 20. | MPH-059126 | December 30, 2009 |
| 21. | MPE-042868 | January 14, 2010 |

35

22.    MPE-042870           January 14, 2010

c.  Certificates of Islamic Slaughter (also known as "Halal Export
    Certificates") were generated and signed by, or on behalf of, the
    Director of ISA, for exports of beef products from the United
    States, including on about the following dates, each of which is
    alleged as a separate overt act:

|      | Certificate No.   | Issue Date         |
|------|-------------------|--------------------|
| 1.   | 0620-07-5156      | June 22, 2007      |
| 2.   | 0921-07-6327      | September 21, 2007 |
| 3.   | 0817-07-6177      | August 17, 2007    |
| 4.   | 0130-08-6916      | January 30, 2008   |
| 5.   | 0424-08-7117      | April 24, 2008     |
| 6.   | 0619-08-7805      | June 19, 2008      |
| 7.   | 0716-08-7951      | July 16, 2008      |
| 8.   | 0731-08-8027      | July 31, 2008      |
| 9.   | Jumada II 1429H   | August 2008        |
| 10.  | 0924-08-8285      | September 24, 2008 |
| 11.  | 1022-08-8387      | October 22, 2008   |
| 12.  | 0416-09-9160      | April 16, 2009     |
| 13.  | 0416-09-9161      | April 16, 2009     |
| 14.  | 1006-09-9999      | June 10, 2009      |
| 15.  | 0925-09-9610      | September 25, 2009 |
| 16.  | 1022-09-9700      | October 22, 2009   |
| 17.  | INDO-09-1A        | October 30, 2009   |
| 18.  | INDO-09-2A        | November 20, 2009  |
| 19.  | 1203-09-9809      | December 3, 2009   |
| 20.  | 1230-09-9893      | December 30, 2009  |
| 21.  | 0114-10-9935      | January 14, 2010   |
| 22.  | INDO-10-1A        | January 14, 2010   |
| 23.  | 0503-10-10327     | May 3, 2010        |
| 24.  | 0528-10-10429     | June 28, 2010      |
| 25.  | 0701-10-10562     | July 1, 2010       |
| 26.  | 0712-10-10599     | July 12, 2010      |
| 27.  | 0730-10-10660     | July 30, 2010      |

| 28. | 0824-10-10718 | August 24, 2010 |
| 29. | 0909-10-10771 | September 9, 2010 |
| 20. | 1018-10-10968 | October 18, 2010 |
| 31. | 1202-10-11204 | December 2, 2010 |
| 32. | 1203-10-11207A | December 3, 2010 |
| 33. | 1217-10-11309 | December 17, 2010 |
| 34. | 0113-11-11492 | January 13, 2011 |
| 35. | 0126-11-11602 | January 26, 2011 |
| 36. | 0209-11-11708 | February 9, 2011 |
| 37. | 0318-11-11932 | March 18, 2011 |
| 38. | 0407-11-12036 | April 7, 2011 |
| 39. | 0629-11-12520 | June 29, 2011 |
| 40. | 0707-11-12554 | July 7, 2011 |
| 41. | 0726-11-12684 | July 26, 2011 |
| 42. | 0915-11-13005 | September 15, 2011 |
| 43. | 0919-11-13026 | September 19, 2011 |
| 44. | 1104-11-13304 | November 4, 2011 |
| 45. | 1010-11-13140 | October 10, 2011 |
| 46. | 1115-11-13369 | November 15, 2011 |
| 47. | 0111-12-13794 | January 11, 2012 |
| 48. | 0111-12-13801 | January 11, 2012 |
| 49. | 0111-12-13748 | January 11, 2012 |
| 50. | 0120-12-13878 | January 20, 2012 |
| 51. | 0129-12-13902 | January 23, 2012 |
| 52. | 0210-12-14041 | February 10, 2012 |
| 53. | 0216-12-14080 | February 16, 2012 |
| 54. | 0323-12-14343 | March 23, 2012 |
| 55. | 0405-12-14442 | April 5, 2012 |
| 56. | 0405-12-14424 | April 5, 2012 |

d. USDA Export Certificates, Certificates of Islamic Slaughter, (corresponding to the respective item numbers noted in subparagraphs (a) and (c) above) and other documents pertaining to particular beef shipments were sent via wire by defendant MIDAMAR to customers in Malaysia and Indonesia, including on

37

about the dates noted below, each of which is alleged as a separate overt act:

| No. | Date | Country | Method |
|-----|------|---------|--------|
| 17. | 11-03-2009 | Indonesia | e-mail |
| 18. | 11-23-2009 | Indonesia | e-mail |
| 19. | 12-03-2009 | Malaysia | e-mail |
| 20. | 12-30-2009 | Malaysia | e-mail |
| 21. | 01-14-2010 | Malaysia | e-mail and fax |
| 22. | 01-14-2010 | Indonesia | e-mail |

e. USDA Export Certificates, Certificates of Islamic Slaughter, and other documents pertaining to particular beef shipments were deposited to be delivered with a private commercial interstate carrier, for shipments to Malaysia and Indonesia, including on about the dates noted below, each of which is alleged as a separate overt act:

| | Export No. | Date | Carrier |
|---|-----------|------|---------|
| 1. | 42870 | 01-14-2010 | Forward Air |
| 2. | 42868 | 01-14-2010 | Forward Air |
| 3. | 59126 | 12-31-2009 | Forward Air |
| 4. | 59115 | 12-03-2009 | Forward Air |
| 5. | 59111 | 11-23-2009 | DHL |
| 6. | 59099 | 10-31-2009 | Forward Air |
| 7. | 59091 | 10-22 -2009 | Forward Air |

f. Payments were wired to defendant MIDAMAR's CRBT bank account "1568" on about the dates noted below, from the countries noted below, for beef products purchased from defendant MIDAMAR, and exported by defendant MIDAMAR, to customers in the countries noted below, with each payment being alleged as an overt act:

| | Date | Payment | Customer's Country |
|---|------|---------|--------------------|
| 1. | 09-19-2007 | $244,914.23 | Malaysia |
| 2. | 08-21-2008 | 10,735.00 | Malaysia |
| 3. | 09-10-2008 | 93,626.52 | Malaysia |
| 4. | 09-19-2008 | 14,985.00 | Malaysia |

38

| 5. | 11-04-2008 | 28,708.08 | Malaysia |
|---|---|---|---|
| 6. | 12-05-2008 | 207,613.02 | Malaysia |
| 7. | 05-14-2009 | 16,475.08 | Malaysia |
| 8. | 05-28-2009 | 6,439.00 | Malaysia |
| 9. | 06-24-2009 | 17,791.69 | Malaysia |
| 10. | 10-23-2009 | 4,510.00 | Malaysia |
| 11. | 10-28-2009 | 7,982.50 | Indonesia |
| 12. | 11-13-2009 | 8,985.00 | Malaysia |
| 13. | 11-25-2009 | 15,081.33 | Malaysia |
| 14. | 11-24-2009 | 31,794.92 | Indonesia |
| 15. | 12-29-2009 | 16,105.73 | Malaysia |
| 16. | 01-19-2010 | 7,685.00 | Malaysia |
| 17. | 01-19-2010 | 31,874.80 | Indonesia |
| 18. | 01-28-2010 | 74,459.40 | Malaysia |
| 19. | 07-06-2010 | 29,584.07 | UAE |
| 20. | 07-09-2010 | 84,271.88 | Kuwait |
| 21. | 08-31-2010 | 52,768.84 | Kuwait |
| 22. | 09-07-2010 | 115,091.53 | Kuwait |
| 23. | 09-16-2010 | 180,103.37 | UAE |
| 24. | 10-12-2010 | 132,574.15 | Kuwait |
| 25. | 10-12-2010 | 132,574.15 | UAE |
| 26. | 10-21-2010 | 66,347.67 | Kuwait |
| 27. | 12-21-2010 | 127,551.39 | Kuwait |
| 28. | 12-30-2010 | 98,975.50 | UAE |
| 29. | 01-26-2011 | 90,570.59 | Kuwait |
| 30. | 01-31-2011 | 87,378.19 | UAE |
| 31. | 03-07-2011 | 159,505.22 | UAE |
| 32. | 03-21-2011 | 120,869.95 | Kuwait |
| 33. | 04-04-2011 | 71,722.14 | Kuwait |
| 34. | 05-09-2011 | 240,399.96 | Kuwait |
| 35. | 05-31-2011 | 164,267.50 | UAE |
| 36. | 08-22-2011 | 138,476.93 | UAE |
| 37. | 08-22-2011 | 223,128.75 | Kuwait |
| 38. | 09-15-2011 | 148,794.36 | UAE |
| 39. | 10-24-2011 | 133,413.92 | UAE |
| 40. | 11-14-2011 | 187,604.38 | Kuwait |

39

| | | |
|---|---|---|
| 41. 12-09-2011 | 121,285.00 | UAE |
| 42. 12-15-2011 | 172,831.92 | UAE |
| 43. 01-04-2012 | 104,359.10 | UAE |
| 44. 02-28-2012 | 150,134.65 | UAE |
| 45. 03-06-2012 | 119,223.12 | UAE |
| 46. 03-20-2012 | 25,337.43 | Kuwait |
| 47. 04-09-2012 | 62,946.79 | UAE |
| 48. 04-27-2012 | 139,984.52 | Kuwait |
| 49. 05-01-2012 | 94,360.95 | UAE |
| 50. 05-15-2012 | 61,158.15 | Kuwait |
| 51. 05-29-2012 | 139,330.09 | UAE |
| 52. 05-31-2012 | 77,950.20 | UAE |
| 53. 06-13-2012 | 91,549.00 | UAE |
| 54. 07-06-2012 | 45,110.77 | Kuwait |
| 55. 07-09-2012 | 142,517.55 | UAE |
| 56. 08-14-2012 | 160,769.78 | Kuwait |
| 57. 09-12-2012 | 139,973.98 | UAE |
| 58. 09-21-2012 | 258,287.76 | Kuwait |

63. This was all in violation of Title 18, United States Code, Section 371.

## COUNTS 2-4
### False Statement on Export Certificates

64. Paragraphs 1-53, 56-60, and 62 of this Indictment are incorporated by this reference as if fully set forth here.

65. On about the following dates, each such act constituting a separate count, in the Northern District of Iowa, defendants JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION, ISLAMIC SERVICES OF AMERICA, and ISA, INC., d/b/a "Islamic Services of America, Inc.," did knowingly make, aid, abet, counsel, induce, and procure the making of a materially false statement, with the

40

intent to defraud, on an official certificate provided for in regulations prescribed by the Secretary of Agriculture (Title 9 of the Code of Federal Regulations),to wit: by stating on a Department of Agriculture, Food Safety Inspection Service Form 9060-5, that the meat products reflected thereon were produced at USDA establishment number 889A, when in truth and fact the products had been produced at USDA establishment number 683.

| COUNT | | Date | Certificate Number |
|---|---|---|---|
| 66. | 2 | December 30,2009 | MPH-059126 |
| 67. | 3 | January 14, 2010 | MPE-042868 |
| 68. | 4 | January 14, 2010 | MPE-042870 |

69. This was in violation of Title 21, United States Code, Section 611(b)(5), and Title 18, United States Code, Section 2.

## COUNTS 5 – 47
### Wire Fraud

70. Paragraphs 1-53, 55-62, and 65-68 of this Indictment are incorporated herein by this reference.

### Scheme to Defraud

71. Defendants JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION (MIDAMAR), ISLAMIC SERVICES OF AMERICA (ISA), ISA INC., d/b/a "Islamic Services of America, Inc.," and others known to the grand jury, devised, intended to devise, and attempted to devise, a scheme and artifice, to

41

defraud; and to obtain money by false and fraudulent pretenses and promises; involving the marketing, sale, and shipment of purported Halal beef to customers in Indonesia, Malaysia, Kuwait, the United Arab Emirates, the United States of America, and elsewhere, as more fully outlined in the paragraphs incorporated above.

72. On about each of the dates referenced below, in the Northern District of Iowa, for the purpose of executing or attempting to execute the above-referenced scheme and artifice, to defraud; and to obtain money by means of false and fraudulent pretenses, representations, and promises; the defendants and their authorized representatives knowingly caused, induced, procured, and aided and abetted the transmission, by means of wire communication in interstate and foreign commerce, of monetary payments to defendant MIDAMAR's bank account "1568" at CRBT, as outlined below, each transmission constituting a separate count:

| ¶ | COUNT | Date | Amount Transmitted | Payment on Behalf of Customer / Country |
|---|---|---|---|---|
| 73. | 5 | December 29, 2009 | $ 16,105.73 | Suvinsa / Malaysia |
| 74. | 6 | January 19, 2010 | 7,685.00 | PT Indoguna (Surya Cemerlang) /Indonesia |
| 75. | 7 | January 19, 2010 | 31,874,80 | Suvinsa / Malaysia |
| 76. | 8 | January 28, 2010 | 74,459.40 | Suvinsa / Malaysia |
| 77. | 9 | July 6, 2010 | 29,584.07 | Trans Ocean / UAE |
| 78. | 10 | July 9, 2010 | 84,271.88 | Al Ashrafiya / Kuwait |
| 79. | 11 | August 31, 2010 | 52,768.84 | Al Ashrafiya / Kuwait |
| 80. | 12 | September 7, 2010 | 115,091.53 | Al Ashrafiya / Kuwait |
| 81. | 13 | September 16, 2010 | 180,103.37 | Trans Ocean / UAE |
| 82. | 14 | October 12, 2010 | 132,574.15 | Trans Ocean / UAE |

| | | | | |
|------|----|--------------------|------------|------------------------|
| 83. | 15 | October 21, 2010 | 66,347.67 | Al Ashrafiya / Kuwait |
| 84. | 16 | December 21, 2010 | 127,551.39 | Al Ashrafiya / Kuwait |
| 85. | 17 | December 30, 2010 | 98,975.50 | Trans Ocean / UAE |
| 86. | 18 | January 26, 2011 | 90,570.59 | Al Ashrafiya / Kuwait |
| 87. | 19 | January 31, 2011 | 87,378.19 | Trans Ocean / UAE |
| 88. | 20 | March 7, 2011 | 159,505.22 | Al Ashrafiya / UAE |
| 89. | 21 | March 21, 2011 | 120,869.95 | Al Ashrafiya / Kuwait |
| 90. | 22 | April 4, 2011 | 71,722.14 | Al Ashrafiya / Kuwait |
| 91. | 23 | May 9, 2011 | 240,299.96 | Al Ashrafiya / Kuwait |
| 92. | 24 | May 31, 2011 | 164,267.50 | Al Ashrafiya / UAE |
| 93. | 25 | August 22, 2011 | 138,476.93 | Trans Ocean / UAE |
| 94. | 26 | August 22, 2011 | 223,128.57 | Al Ashrafiya / Kuwait |
| 95. | 27 | September 15, 2011 | 148,794.36 | Trans Ocean / UAE |
| 96. | 28 | October 24, 2011 | 133,413.92 | Trans Ocean / UAE |
| 97. | 29 | November 7, 2011 | 187,604.38 | Al Ashrafiya / Kuwait |
| 98. | 30 | December 9, 2011 | 121,285.00 | Trans Ocean / UAE |
| 99. | 31 | December 15, 2011 | 172,831.92 | Trans Ocean / UAE |
| 100. | 32 | January 30, 2012 | 104,359.10 | Trans Ocean / UAE |
| 101. | 33 | February 28, 2012 | 150,134.65 | Al Ashrafiya / UAE |
| 102. | 34 | March 6, 2012 | 119,223.12 | Al Ashrafiya / UAE |
| 103. | 35 | March 20, 2012 | 25,337.43 | Al Ashrafiya / Kuwait |
| 104. | 36 | April 9, 2012 | 62,946.79 | Al Ashrafiya / UAE |
| 105. | 37 | April 27, 2012 | 139,984.52 | Al Ashrafiya / Kuwait |
| 106. | 38 | May 1, 2012 | 94,360.95 | Al Ashrafiya / UAE |
| 107. | 39 | May 15, 2012 | 61,158.15 | Al Ashrafiya / Kuwait |
| 108. | 40 | May 29, 2012 | 139,330.09 | Al Ashrafiya / UAE |
| 109. | 41 | May 31, 2012 | 77,950.20 | Al Ashrafiya / UAE |
| 110. | 42 | June 13, 2012 | 91,549.00 | Al Ashrafiya / UAE |
| 111. | 43 | July 6, 2012 | 45,110.77 | Al Ashrafiya / Kuwait |
| 112. | 44 | July 9, 2012 | 142,517.55 | Al Ashrafiya / UAE |
| 113. | 45 | August 14, 2012 | 160,769.78 | Al Ashrafiya / Kuwait |
| 114. | 46 | September 20, 2012 | 139,973.98 | Al Ashrafiya / UAE |
| 115. | 47 | September 21, 2012 | 258,287.76 | Al Ashrafiya / Kuwait |

116. This was all in violation of Title 18, United States Code, Sections 1343 and 2.

## Wire Fraud Forfeiture Allegation

117.    The allegations contained in paragraphs 1-53, 55-62, 65-68, and 71-115 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

118.    Upon conviction of the offenses in violation of Title 18, United States Code, Sections 371 and 1343, set forth in Counts 1, and Counts 5 - 47, inclusive, of this Indictment, the defendants, JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION (MIDAMAR), ISLAMIC SERVICES OF AMERICA (ISA), and ISA INC., d/b/a "Islamic Services of America, Inc.," shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. This may include, but is not limited to, a money judgment equal to the sum of said proceeds.

119.    If any of the property described above, as a result of any act or omission of the defendant:

        a.    cannot be located upon the exercise of due diligence;

        b.    has been transferred or sold to, or deposited with, a third party;

        c.    has been placed beyond the jurisdiction of the court;

        d.    has been substantially diminished in value; or

        e.    has been commingled with other property which cannot be divided without difficulty,

44

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

## COUNTS 48- 91
### Money Laundering

120. The allegations contained in paragraphs 1-53, 55-62, 65-68, and 71-115 of this Indictment are hereby re-alleged and incorporated by reference.

121. On about each date specified below, in the Northern District of Iowa and elsewhere, with each transaction constituting a separate count, defendants, JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION (MIDAMAR), ISLAMIC SERVICES OF AMERICA (ISA), and ISA INC., d/b/a "Islamic Services of America, Inc.,"did knowingly cause, aid, abet, induce, and procure the transmission and transfer of a monetary instrument and funds to a place in the United States, (CRBT account "1568"), from or through a place outside the United States (noted in the chart below), with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343.

| ¶ | COUNT | Date | Amount Transferred | Transferred From |
|------|-------|----------------|--------------------|---------------------------|
| 122. | 48 | April 21, 2010 | $ 140,401.90 | Habib Bank AG Zurich Dubai, UAE |
| 123. | 49 | May 12, 2010 | 94,089.55 | Habib Bank AG Zurich Dubai, UAE |
| 124. | 50 | June 7, 2010 | 169,734.95 | Habib Bank AG Zurich Dubai, UAE |

45

| 125. | 51 | July 9, 2010 | 84,271.88 | Alahli Bank of Kuwait Safat, Kuwait |
| 126. | 52 | August 5, 2010 | 93,254.35 | Emirates NBD Bank Dubai, UAE |
| 127. | 53 | August 10, 2010 | 228,193.90 | HBME Kuwait Main Safat, Kuwait |
| 128. | 54 | August 12. 2010 | 71,356.88 | Habib Bank AG Zurich Dubai, UAE |
| 129. | 55 | August 24, 2010 | 280,328.60 | Habib Bank AG Zurich Dubai, UAE |
| 130. | 56 | August 31, 2010 | 52,768.84 | Alahli Bank of Kuwait Safat, Kuwait |
| 131. | 57 | September 24, 2010 | 85,762.14 | CIMB Bank Berhad Kuala Lumpur, Malaysia |
| 132. | 58 | October 28, 2010 | 186,638.13 | Habib Bank AG Zurich Dubai, UAE |
| 133. | 59 | November 15, 2010 | 130,644.54 | Emirates NBD Bank Dubai, UAE |
| 134. | 60 | December 24, 2010 | 94,422.20 | Habib Bank AG Zurich Dubai, UAE |
| 135. | 61 | January 4, 2011 | 141,473.14 | Fimbank P.L.C. Sliema, Malta |
| 136. | 62 | January 28, 2011 | 182,587.30 | Habib Bank AG Zurich Dubai, UAE |
| 137. | 63 | February 22, 2011 | 111,448.63 | Emirates NBD Bank Dubai, UAE |
| 138. | 64 | March 7, 2011 | 87,168.00 | Al-Rajhi Banking and Investment Corp. Saudi Arabia |
| 139. | 65 | March 8, 2011 | 95,011.85 | Ahli United Bank SC Kuwait |
| 140. | 66 | March 18, 2011 | 97,274.73 | Emirates NBD Bank Dubai, UAE |
| 141. | 67 | March 30, 2011 | 96,482.02 | Habib Bank AG Zurich Dubai, UAE |
| 142. | 68 | April 15, 2011 | 133,679.74 | Habib Bank AG Zurich Dubai, UAE |
| 143. | 69 | May 16, 2011 | 167,444.50 | Emirates NBD Bank Dubai, UAE |

Case 1:14-cr-00138-LRR-CJW   Document 6   Filed 12/05/14   Page 46 of 50

| 144. | 70 | May 19, 2011 | 93,210.00 | Ahli United Bank SC Kuwait |
|---|---|---|---|---|
| 145. | 71 | June 23, 2011 | 136,063.22 | Emirates NBD Bank Dubai, UAE |
| 146. | 72 | June 29, 2011 | 212,871.78 | Habib Bank AG Zurich Dubai, UAE |
| 147. | 73 | July 28, 2011 | 79,972.00 | Al-Rajhi Banking and Investment Corp. Saudi Arabia |
| 148. | 74 | August 16, 2011 | 132,117.77 | Emirates NBD Bank Dubai, UAE |
| 149. | 75 | August 18, 2011 | 71,823.25 | PT Bank Central Asia Jakarta, Indonesia |
| 150. | 76 | September 19, 2011 | 243,052.63 | Habib Bank AG Zurich Dubai, UAE |
| 151. | 77 | October 21, 2011 | 116,862.89 | Emirates NBD Bank Dubai, UAE |
| 152. | 78 | October 27,2011 | 129,538.96 | MISR Iran Development Bank, Cairo, Egypt |
| 153. | 79 | November 1, 2011 | 228,630.98 | Habib Bank AG Zurich Dubai, UAE |
| 154. | 80 | November 28, 2011 | 90,632.00 | Emirates NBD Bank Dubai, UAE |
| 155. | 81 | December 6, 2011 | 176,270.90 | Emirates NBD Bank Dubai, UAE |
| 156. | 82 | January 1, 2012 | 194,573.86 | Mashreq Bank PSC Dubai,UAE |
| 157. | 83 | January 19, 2012 | 101,425.84 | Habib Bank AG Zurich Dubai, UAE |
| 158. | 84 | February 9, 2012 | 104,743.71 | Mashreq Bank PSC Dubai,UAE |
| 159. | 85 | February 21, 2012 | 88,560.00 | Habib Bank AG Zurich Dubai, UAE |
| 160. | 86 | February 27, 2012 | 95,350.00 | Emirates NBD Bank Dubai, UAE |
| 161. | 87 | March 28, 2012 | 174,691.36 | National Bank of Fujairah Dubai, UAE |

47

| 162. | 88 | April 9, 2012 | 62,946.79 | HSBC Bank Middle East Doha, Qatar |
| 163. | 89 | April 19, 2012 | 235,363.16 | Mashreq Bank PSC Dubai, UAE |
| 164. | 90 | May 1, 2012 | 94,360.95 | HSBC Bank Middle East Doha, Qatar |
| 165. | 91 | May 31. 2012 | 77,950.20 | Mashreq Bank PSC Dubai, UAE |

166. This was in violation of Title 18, United States Code, Section 1956(a)(2)(A).

### COUNT 92
### Money Laundering Conspiracy

167. The allegations contained in paragraphs 1-53, 55-62, 65-68, 71-115, and 121-165 of this Indictment are hereby re-alleged and incorporated by reference.

168. Beginning in at least 2007 and continuing through about 2012, in the Northern District of Iowa and elsewhere, defendants JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION (MIDAMAR), ISLAMIC SERVICES OF AMERICA (ISA), and ISA INC., d/b/a "Islamic Services of America, Inc.," did knowingly and unlawfully conspire and agree with other persons whose names are known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit: to transmit and transfer monetary instruments and funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343.

169. This was in violation of Title 18, United States Code, Section 1956(h).

48

## Money Laundering Forfeiture Allegation

170. The allegations contained in Counts 48 – 91, inclusive, of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(1).

171. Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956 (Counts 48 – 92 above), the defendants JALEL AOSSEY, WILLIAM "YAHYA" AOSSEY, MIDAMAR CORPORATION (MIDAMAR), ISLAMIC SERVICES OF AMERICA (ISA), and ISA INC., d/b/a "Islamic Services of America, Inc.,"shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.

172. If any of the property described above, as a result of any act or omission of the defendants:

       a.   cannot be located upon the exercise of due diligence;
       b.   has been transferred or sold to, or deposited with, a third party;
       c.   has been placed beyond the jurisdiction of the court;
       d.   has been substantially diminished in value; or
       e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section

49

2461(c).

A TRUE BILL

KEVIN W. TECHAU
United States Attorney

By: _____

RICHARD L. MURPHY
Assistant United States Attorney

s/Foreperson

Foreperson

12-5-14
Date