IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14-CR-00138-LRR |
| | ) | |
| vs. | ) | |
| | ) | |
| ISLAMIC SERVICES OF AMERICA, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ISA, INC., | ) | |
| d/b/a "Islamic Services of America" | ) | |
| | ) | |
| Defendants. | ) | |

## SENTENCING MEMORANDUM

The United States submits the following information regarding the

upcoming sentencing hearing in this matter:

### I.    WITNESSES

The United States anticipates it may call the following witnesses:

    A.  USDA OIG Special Agent Brad Meyer
    B.  IRS Special Agent Mike Hare

### II.    EXHIBITS

The United States will submit a separate prospective exhibit list that will

include all exhibits that may relate to any of the defendants charged in Northern

District of Iowa Case No. 14-CR-00138-LRR.

1

## III.  CONTESTED ISSUES

The United States is aware of the following issues that will need to be resolved at sentencing:

1. Whether the offense involved sophisticated means, pursuant to USSG §2B1.1(b)(10)(C);

2. Whether, absent a sophisticated means enhancement, the offense involved mass marketing, pursuant to USSG §2B1.1(b)(2)(A)(ii);

3. Amount of fine, if any, that should be imposed.

ISA, Inc. and Islamic Services of America (collectively "ISA" or "defendant") have also objected to some of the factual statements made in the pre-sentence report (PSR).   Each of these issues will be separately addressed below.

### Factual Objections

### a.  ISA Certification

Defendant objects to the statement in paragraph 13 of the PSR that "ISA certified all beef originating from PM [PM Beef] as complying with the standards represented on ISA's website."   *See* (discussion of objection at PSR page 7). Defendant contends its halal certificates only certified the beef complied with the halal standards.   *Id.*

While defendant's objection is technically accurate, in that ISA did not specifically claim on its certifications that, "the statements on its website were

2

accurate," the objection seeks to split hairs.   As summarized at paragraph 35 of the Indictment, (Docket 6), defendant's website made a variety of claims, statements, and representations about its standards, the benefits of certification, Islamic slaughter and supervision, and the acceptability of certain practices and types of religious slaughter vis a vis halal.   *Id.*

The website specifically stated that "halal slaughtered meat that bears halal designation and *certification* [emphasis added] must be qualified by a few basic principles," and these include, first, that "the slaughtering process must be conducted by a practicing Muslim," and, second, the person who is doing the slaughtering must recite a prayer, the "Tasmia . . . out loud during the slaughter on each head."   (Exhibit 20).   These requirements were repeated elsewhere on the site. (Exhibit 21).   These representations were important because as the investigation showed, a significant portion of beef slaughtered at PM was not slaughtered by a Muslim and therefore the Tasmia was not recited over the slaughter.   The website statements absolutely support the claim made at PSR ¶13 that the ISA certification indicated adherence with the website representations.

Further, Midamar's website touted: defendant's "ethics and principles;" that it has "employed the most stringent standards" to ensure products are "Shariah halal compliant;" that is has "earned the trust of consumers and

3

industry members worldwide;" that it is "truly committed to maintaining the integrity of both halal certification and the science behind it;" that it has been accredited by organizations that represent "the world's most stringent enforced halal standards;" that it has been recognized by Islamic groups across the USA "for its integrity in maintaining the highest standards;" that "ISA only accepts halal methods that follow Shariah in its purest form;" and numerous similar claims.

Defendant's and Midamar's websites also explained "Why kosher is not halal" and stated that "the use of captive bolt stunning in any capacity negates the halal slaughter process." *See* (Exhibit 24). This was important because defendant certified as halal beef slaughtered as kosher and shot in the head with a captive bolt stun gun, contrary to the verifiable representations made on the website.

Based upon all of the representations above, it is reasonable to conclude that when defendant certified a beef product, the consumer would have been right to believe the certification was consistent with the representations made by defendant on its website concerning the requirements and standards that needed to be met to constitute halal.

### b. Use of Captive Bolt Stunning

As noted at paragraph 13 of the PSR, defendant objects to the statement

4

that "all cattle slaughtered at PM [PM Beef] were shot in the head with a brain penetrating captive bolt stun gun that punctured the skull and caused the animals to die from brain hemorrhage." (PSR ¶13). However, the investigation showed all animals were in fact shot in the head with the captive bolt stun gun. Lisa Hernandez, Vice-President of Operations for PM, advised this was the fact. USDA investigators also obtained photos of the actual captive bolt devices used in the plant. (Exhibit 22). As indicated on defendant's and Midamar's websites, "Penetrative Captive Bolt Stunning" uses a captive bolt gun that "shoots a retractable steel rod into the head of the animal puncturing the skull and brain causing the animal to die from a brain hemorrhage." *See* (Exhibit 24). "Captive bolt stunning kills the animal." *Id.*

Defendant notes the parties stipulated the animals had their throats cut before being shot in the head with the captive bolt stun gun. That is true, but the parties also agreed "the gun was used after" the neck had been cut. Indeed, the gun was used instantaneously upon the throat being cut. As defendant's former Director advised a prospective customer in 2010, "the animal may only be stunned after a proper slaughter takes place and the stun <u>may never penetrate the skull or cause irreversible damage to the skull or brain.</u>" (Exhibit 25). Further, although cutting an animal's throat may render the animal unconscious within 15 seconds or so, the animal continues to have brain activity for up to 8

minutes. *Id.* Because the animals had not yet died by having their throats cut, the captive bolt stun gun was used to expedite their death. Were this not the case, there would have been no reason to use the captive bolt stun gun immediately after cutting the throat of the animal.

This is not an idle point. Midamar claimed its food was held "to the highest integrity at the point of slaughter" and bragged its products were certified by defendant , a "'leading internationally recognized halal certifier." In turn, defendant claimed to adhere to the "strictest" or "most stringent" halal standards, and made other claims that defined those standards. *See e.g.* . (Exhibit 21). Necessarily, if defendant did adhere to the most stringent standards then it halal certification would have meant that the beef it was certifying would have met or surpassed any published standard for halal meat products established by a country where defendant did business. However, this was demonstrably not the case. Because of the incestuous relationship between defendant and Midamar, both companies well knew defendant did not live up to the verifiable claims it made publicly, including on its website administered by an owner and director of both businesses.

For instance, Midamar exported beef to Malaysia and claimed to continue to do so even after the OPEER investigation. At all times relevant, the Malaysian Protocol for halal Meat Production prohibited the use of any device

6

that so much as cracked the skull of the animal.   *See* (Exhibit 26).   Defendant's founder and the founder of Midamar, William Aossey, testified at his trial he was aware of the Malaysian protocol and acknowledged it would be a violation of the protocol if an animal was shot in the head with a brain penetrating captive bolt stun gun.   (Exhibit 27).   Aossey stated the use of such a device "would not be lawful [under] halal, kosher, or Sharia law or Christian law."   *Id.*   Perhaps this is why Aossey directed that no stunning be performed when Malaysian inspectors were to visit the PM plant in 2011.   (Exhibit 28).

Defendant's objection to PSR ¶13 is unfounded and appears to be an attempt to falsely mitigate defendant's conduct.   Contrary to representations made by defendant, captive bolt stunned animals were given a halal cerification.

### c.  ISA's Representations

Defendant challenges the statements at PSR paragraph 43.   *See* (discussion of objections at PSR page 7).

Defendant claims it is unclear whether anyone actually viewed its website or relied upon its representations.   This claim is disingenuous at best.   As defendant is fully aware, weekly reports were received concerning activity on its website.   *See e.g.* (Exhibit 29).   Similar reports were received for the Midamar websites.   Orders were placed for products via the Midamar e-commerce site. That site contained a link to the defendant's website and proudly advertised its

7

use of defendant's services. *See e.g.* (Exhibits 23, 31, 32).

Defendant claims all the beef referenced between April 2010 and April 2012 in Kuwait and the UAE was distributed to a single entity. This is simply not true. The beef was sold to two large distributors, Al Ashrafiya and Trans Ocean. *See* (Exhibits 77, 78). These customers did not consume the beef, but sold it to others who consumed it. This is not to suggest that Midamar did not sell, or defendant did not certify, beef that suffered from the same deficiencies, to other customers around the world at the same time. Indeed, Midamar had customers around the world but neither it nor defendant had an effective system in place to identify which products had been slaughtered at PM by a Muslim slaughterman and which had not. Thus, claims that beef products originated from animals slaughtered by a Muslim were often not true. Further as noted, all cattle were shot in the head with a brain penetrating captive bolt at PM. These verifiable deficiencies, alone, were contrary to most published halal standards and the representations made by defendant and Midamar.

### d. Claim Regarding Rabbinical Slaughter as halal

Defendant objects to the summary at PSR paragraph 47 concerning 40 shipments of beef flank between 2010 and mid-2012 to Kuwait and UAE that had actually been slaughtered as kosher without any Muslim supervision. *See* (discussion of objection at PSR pages 7-8). Defendant's objection is summarized

as a claim that by 2010 it "sincerely held the belief and conclusion that a Jewish or Rabinnical slaughter satisfied halal requirements." *Id.* However, the investigation has shown defendant did not live up to verifiable representations it made concerning the standards it followed for certification of halal beef slaughter, nor did it change its practice in this regard in 2010.

As an initial matter, defendant claimed on its website that kosher is not the same as halal. "If a product is kosher certified, it does not mean the product is halal." (Exhibit 37).

Further, defendant's Director, defendant's owner, and Midamar employees repeatedly claimed in a variety of emails, presentations, and other documents that kosher was not the same as halal and could not be marketed or sold as halal. *See e.g.* (Exhibits 39, 40, 41, 42, 43, 44, 45, 46, 54).

Employees of Midamar and ISA also understood kosher was different than halal and questioned and repeatedly expressed concern about kosher beef products from PM being accepted as halal.

In 2012, when Department of Agriculture OIG Special Agent Brad Meyer interviewed defendant's owners (Jalel and Yahya), they claimed they had attended a conference in Saudi Arabia in early 2012 where religious leaders first indicated kosher meat would be accepted as halal provided the slaughter had been supervised by a Muslim. However, they conceded that Malaysia had the

Case 1:14-cr-00138-LRR-CJW   Document 205   Filed 02/08/16   Page 9 of 22

most defined standards and the Malaysians would "absolutely not" accept kosher slaughter that had only been supervised by a Muslim slaughter man.   In fact, as shown by the Malaysian Protocol, Malaysia required beef to be slaughtered by a "practicing Muslim slaughterman" in order to qualify as halal.   (Exhibit 26 at 7). Despite this published protocol, ISA issued halal certificates stating beef had been slaughtered by a Muslim slaughterman, though it was confirmed that was not always the case.

In order to comply with Malaysia's halal audit requirements, in 2011 defendant submitted information to the Malaysian Department of Islamic Development (JAKIM) in which it claimed it had provided "qualified, experienced Muslim slaughtermen on demand to perform all halal slaughter done at the PM Beef facility for the past 30 years."   (Exhibit 47 at 5).   This claim was not true. ISA had in fact certified beef as halal from PM without a Muslim slaughterman even being present.

Although the Gulf countries (UAE, Kuwait, and others) permitted the slaughterer to be Muslim, Jewish, or Christian, (Exhibit 48), for much of the relevant time period, defendant falsely certified the slaughter had been conducted by a Muslim slaughterman.   *See e.g.* (Exhibits 77, 78).   By certifying beef products from PM as halal, defendant also certified that the other verifiable Gulf Standard (GS) requirements had been met (such as no use of a bolt shot

Case 1:14-cr-00138-LRR-CJW   Document 205   Filed 02/08/16   Page 10 of 22

pistol or beating on the head).   *Id.*; (Exhibit 48).   As proof that it was important that ISA's certificates be accurate, when the UAE learned in the course of the instant investigation that ISA had been certifying beef that did not comply with the Gulf standards, ISA was delisted as a halal certifier by the UAE.

As further evidence that defendant did not change its view in 2010 on the requirement of a Muslim slaughterman conducting the slaughter, Jalel Aossey authored an email to other officials of defendant and Midamar in February 2012 discussing what he had learned at the conference in Saudi Arabia.   He stated it "breaks my heart," to learn that meat slaughtered by a rabbi and witnessed by a Muslim would be accepted by the Muslim leaders in Saudi Arabia as halal. (Exhibit 49).   In a similar email also in early February 2012, Jalel Aossey stated "[i]t makes me sick to even think about taking a lesser version of halal with the kosher."   (Exhibit 79).   These emails confirm the claim by defendant's owners to Agent Meyer August of 2012 that they learned of this broader halal standard in Saudi Arabia after attending a meeting there in early 2012.

In the August 2012 interview with Agent Meyer, Yahya Aossey claimed that prior to January or February 2012, the only type of beef they certified as halal was "strictly a Muslim slaughter."

Finally, it is notable that other records obtained in the course of the investigation showed defendant did not place a Muslim full-time at PM to

supervise the Rabinnical slaughter until June 2012, after the end date of the charged conspiracy. The fact that this had not been done earlier shows defendant had taken the position kosher could not be marketed or sold as halal as its owners and representatives had repeatedly proclaimed elsewhere. This meant it knowingly provided certifications that did not comply with its represented and verifiable standards.

In light of the above, it is evident defendant represented that Rabbinical slaughtered meat could not be sold as halal and knowingly failed to live up to the representation. Defendant did so for business reasons and not because defendant altered its position on this point in 2010. Any attempt to now claim to the contrary amounts to an attempt to deceive the Court as to defendant's culpability for false and fraudulent conduct.

### e. Impact on Market

Defendant challenges the assertion that its fraudulent conduct could place other producers or the beef export market at risk. To support its claim, defendant notes that Malaysia continued to buy beef from defendant even after learning of the fraud in 2010. (Docket 178 at 3). While that may be true, defendant continued to represent to Malaysia that its beef had been slaughtered in accordance with the verifiable requirements of the Malaysian Protocol, when it had not.

As admitted by defendant's owners, Malaysia would not accept "kosher" slaughter as halal. Midamar had no adequate process in place to differentiate between kosher slaughtered product from PM and halal slaughtered from PM. Defendant did not disclose to Malaysia that some of its beef from PM was sourced from slaughter conducted by a Muslim, something defendant knew would not be acceptable to Malaysia.

Further, when the Malaysians came to inspect PM in 2011, as noted in an email from defendant's Director, defendant's founder gave instructions that there should be no captive bolt stunning while the Malaysians were present. (Exhibit 50 at 2). This direction was given because the Malaysians would not have approved of the use of captive bolt stunning.

Finally, when interviewed by Agent Meyer in 2012, Jalel Aossey admitted that falsely certifying products as Halal where no Muslim slaughterman was present may allow a company to "mak[e] a ton of money doing it, but you're really hurting the strength of the market itself." "You're hurting the industry more than you are helping it."

In light of deceptive actions such as those mentioned above, it is very likely the Malaysians have been able to conduct an accurate audit to confirm whether its verifiable standards were being met as certified.

**Legal Issues**

**1. Sophisticated Means**

The parties agreed to litigate whether a 2-level increase is warranted pursuant to USSG §2B1.1(b)(10) on account of the offense involving sophisticated means. (Plea agreement ¶ 10(c)). Alternatively, the parties will litigate whether the mass-marketing adjustment at USSG §2B1.1(b)(2) applies. *Id.* However, the government agreed it would only seek one of these enhancements, given the overlap in the use of mass-marketing with regards to each. *Id.*

USSG §2B1.1(b)(10)(C) provides that a two-level upward adjustment is appropriate if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The Commentary to this Guideline further explains,

> For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

USSG §2B1.1, cmt. (n.9); *see, e.g., United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009) (quoting and applying this section of Commentary to the Guidelines).

In construing the sophisticated means enhancement, this Court has applied Eighth Circuit Court of Appeals precedent and observed, "In addition to the examples enumerated by the Guidelines, courts have applied the enhancement when

14

a defendant's scheme involved a 'multi-layered plot,' when a defendant 'created and used numerous false documents,' when a 'defendant's scheme was not a single fraudulent act, but a complex series of fraudulent transactions' and when a defendant's scheme involved forged notary stamps." *United States v. Rubashkin*, 718 F. Supp. 2d 953, 975 (N.D. Iowa 2010) (quoting *United States v. Edelmann*, 458 F.3d 791, 816 (8th Cir.2006)), *aff'd*, 655 F.3d 849 (8th Cir. 2011). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." *United States v. Louper-Morris*, 672 F.3d 539, 564 (8th Cir. 2012) (quoting *United States v. Fiorito,* 640 F.3d 338, 351 (8th Cir.2011)).

Here, defendant pleaded guilty to a multi-faceted conspiracy (Count 1) that included conspiring to: make materially false statements; to sell misbranded products in interstate commerce with intent to defraud; and to commit mail and wire fraud. (Docket 6). The manner and means of the conspiracy as alleged in the Indictment included making numerous false statements on websites advertising Midamar and ISA's products and services, as summarized in the Indictment. The Indictment alleged these false, fraudulent, deceptive, and misleading writings and representations were made at least in part to "result in the payment of money to the defendants and others." (Docket 6 at 26-27).

Defendant's conduct clearly meets the foregoing, multi-faceted standard. As indicated in the PSR, and as established through the USDA investigation, the

Case 1:14-cr-00138-LRR-CJW   Document 205   Filed 02/08/16   Page 15 of 22

fraudulent scheme here involved a mutli-layered plot.    Among other facets, the

scheme involved, but was not limited to: obtaining beef from one slaughter facility

not approved for export to Malaysia and Indonesia and changing the labels to make it

appear as if it originated from another facility on the approved list (PSR ¶¶ 30-34);

creating false and forged official (government) documents (PSR ¶ 33); ISA issued

false halal certificates, purporting to attest that the beef products certified by ISA

had originated from a facility from where they did not originate; the false halal

certificates also attested that beef products had been slaughtered or supervised by a

Muslim slaughterman when that was often not the case; false and fraudulent "health

certificates" were often created to accompany foreign shipments in an attempt to

satisfy foreign import requirements; websites were created by Midamar and ISA that

contained inflated and fabricated statements and claims concerning the standards to

which Midamar and ISA adhered; the websites were directed at customers

worldwide; Midamar and ISA officials falsely touted their adherence to certain

"strict" halal standards in speeches and other sales and marketing efforts; in at least

partial reliance on the false representations, foreign and domestic customers

purchased beef products and wired money to defendant's bank account in the United

States; the scheme was conducted over several years and involved hundreds of

transactions in multiple countries.    As in *Rubashkin*, "[t]he sheer number of false

documents created over a long period of time justifies the enhancement." *Id.*

16

Moreover, as noted in the PSR, defendant's fraud involved multiple corporations, with defendant being the supposed independent certifier. However, defendant actually operated very closely with and often at the direction of Midamar and its employees and owners. This inter-corporate aspect of defendant's conduct was both repetitive and coordinated.

In light of all of the facts, the Court should find defendant's crimes involved sophisticated means and apply a two-level increase. *See* USSG §2B1.1(b)(10)(C).

## 2. <u>Mass Marketing</u>

USSG §2B1.1(b)(2) provides that if the offense "was committed through mass-marketing . . . increase by **2** levels."

For purposes of subsection (b)(2), "mass-marketing" includes "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services . . ." USSG §2B1.1(b)(2), comment. (n. 4(A)).

As alleged in the Indictment, defendant's co-conspirator Midamar advertised its business and products via two websites, Midamarhalal.com and Midamar.com, accessible worldwide. *See* (Exhibits 52, 53). Midamarhalal.com was the website defendant referred to as its "e-commerce site." *See e.g.* (Exhibits 55, 56, 57, 58). Defendant boasted that it was the "first halal food e-commerce site in North America." (Exhibit 59 at 3). Via this site, potential customers and consumers could

view images and testimonials concerning defendant's products and could ask questions, place orders, and pay for the products. *See* (Exhibits 31, 80). Midamar used defendant's halal certification services almost exclusively.

In addition, Midamarhalal.com contained a link to Midamar.com, a website referred to as Midamar's "corporate site." Midamar.com provided additional information concerning Midamar and its international services. Both sites contained links to defendant's website. *See* (Exhibits 23, 81). As summarized in the Indictment, each of the websites contained misleading, false, and fraudulent representations concerning standards and practices adhered to by Midamar and ISA in regards to beef products.

Midamar promoted its websites by including the addresses on its stationary, in its emails, and in its marketing presentations. *See e.g.* (Exhibits 49, 55, 56, 57, 58, 60, 61). Midamar also provided promotional materials that contained its web addresses.
*See e.g.* (Exhibits 62, 63, 64, 65, 66, 67, 68, 69, 70, 71). Midamar prominently advertised its use of defendant's services. *See e.g.* (Exhibits 23, 82). Defendant's website contained false and misleading information concerning ISA's certification practices. Midamar touted defendant as an independent certifying entity, although defendant was really an alter ego of Midamar. Indeed, as Yahya Aossey stated, "no matter how you look at ISA is and always will be part of Midamar and we will not let

ISA get into a position that causes conflict with Midamar's overall business."  *See* (Exhibit 76).

Finally, Midamar's products were mass-marketed its business through the use of telephone, email, the news media, and self–generated magazines, flyers, press releases, or other materials designed to induce a large number of customers to purchase beef that had been falsely represented as having been slaughtered by a Muslim slaughterman, not being the same as kosher, not having been subject to the use of a captive bolt stun gun, or other false and misleading representations.

In light of the circumstances outlined above, and absent the application of a sophisticated means enhancement, a 2-level increase should apply on account of the offense being committed through mass-marketing.  *See United States v. Kieffer,* 621 F.3d 825, 835 (8th Cir 2010) (upholding mass-marketing enhancement where defendant, posing as an attorney, advertised his services on the internet and collected fees through his website); *United States v. Hall,* 604 F.3d 539, 544-45 (8th Cir 2010) (finding mass-marketing enhancement applies, even assuming a website is not widely viewed or shown to have influenced anyone to invest in fraud, as long as website was used to attempt to solicit customers; website was fully accessible to millions of people worldwide via the internet); *United States v. Hanny,* 509 F.3d 916, 920 (8th Cir 2007) (finding mass-marketing enhancement under USSG §2D1.1(b)(5) applied where interactive website amounted to "a billboard on the information

19

superhighway" that allowed the general public to read the products offered for sale and to shop and select those products on the site).

### 3. Fine

<u>Fine Range</u>

The PSR suggests the calculation of the fine range in the plea agreement was incomplete and resulted in a lower guideline fine range than should actually apply in this case.

It appears the guideline fine range set forth in the in the pre-sentence report ($1,200,000 to $2,400,000) (PSR ¶¶ 90, 91) has been accurately calculated. However, the parties stipulated to different fine ranges, depending on the adjusted offense level found by the Court.   (Plea agreement ¶ 9(H).

Although the Court is not bound by the stipulation of the parties (*See* USSG §6B1.4), and the parties remain free to litigate the amount of fine, if any, that should be imposed (Plea Agreement ¶ 18), the United States does not anticipate seeking a fine higher than the applicable range stipulated in the plea agreement.

<u>Ability to Pay</u>

ISA is a viable and profitable business entity and has been for many years. As a consequence of this prosecution and the plea agreements negotiated with the related defendants, it appears Jalel Aossey will remain as the sole owner of ISA.

At the time of Indictment in this case, Jalel and Yahya Aossey each had a half

Case 1:14-cr-00138-LRR-CJW   Document 205   Filed 02/08/16   Page 20 of 22

interest in a number of significant assets and businesses, including in defendant, Midamar, HFP, and JAY Holdings.   Jalel and Yahya also each had essentially a half interest in a 1998 trust and each owns their own home outright and has a significant net worth.

Through various accounting procedures, distributions are made or retained each year by defendant.   Over the past three years, defendant has distributed well over 1.25 million dollars to each of its two owners.   *See* (Exhibits 101, 102, 103).

Defendant's net income in fiscal year 2013 was $760,916; in 2014 was $952,407; and in 2015 was $940,048.   (PSR ¶62).

The bottom line is defendant has the ability to pay a significant fine.

Amount of Fine

Given the scope of the conduct in this case, the government respectfully requests a significant fine be imposed upon defendant.   The government will recommend a specific fine upon learning of the Court's ruling on the applicable fine range.

Conclusion

Wherefore the United States respectfully requests the Court consider the foregoing matters when imposing sentence in this case.

Respectfully submitted,

KEVIN W. TECHAU
United States Attorney

By, *Richard L. Murphy*

RICHARD L. MURPHY

and

By, *Timothy Vavricek*

Assistant United States Attorneys
111 7th Ave. SEBox 1
Cedar Rapids, IA 52401
319-363-6333
319-363-1990 (fax)
Rich.Murphy@usdoj.gov
TVavricek@usa.doj.gov

CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2016, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY BY:

/s/RLM

cc: Haytham Faraj
    Matthew Amarin
    Jason Klinowski